UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
In re:

Natalie Jean-Baptiste,

                    Debtor.
--------------------------------------------------------x
Natalie Jean-Baptiste,

                    Plaintiff,

      -against-

Educational Credit Management
Corporation; NCO Financial Services, Inc.;
and Access Group, Inc.,

                  Defendants.
--------------------------------------------------------x

Case No.: 8-13-72953-las

Chapter 7

Adv. Pro. No.: 8-13-08129-las

MEMORANDUM OPINION AND ORDER DENYING
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

I.    Introduction

    In this adversary proceeding, *pro se* plaintiff Natalie Jean-Baptiste alleges that the

loans held by defendant Access Group, Inc. ("Access")[1] are not "qualified educational loans"

entitled to protection under 11 U.S.C. § 523(a)(8)[2] and thus are subject to discharge under

§ 727.  If the Access loans upon which its claim arose are "qualified educational loans" entitled

to protection under § 523(a)(8), then plaintiff argues, that repayment of the loans, i.e.,

excepting the loans from discharge, will impose an undue hardship on plaintiff.  As to the

latter, plaintiff contends that she meets the burden articulated by the Second Circuit in

---

[1] By stipulation and order, the adversary proceeding as against defendant Educational Credit Management Corporation was settled [dkt. 53]. Defendant NCO Financial Services, Inc. services the Access loans. *See* Answer to Amended Complaint, ¶ 8 [dkt. 21].

[2] Unless otherwise stated, all statutory references are to sections of the United States Bankruptcy Code, 11 U.S.C. § 101 et seq., and will hereinafter be referred to as "§ (section number)".

*Brunner v. N.Y. Higher Educ. Servs. Corp.*, 831 F.2d 395 (2d Cir. 1987), thus establishing that the student loans at issue are dischargeable.

Plaintiff has moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, made applicable by Bankruptcy Rule 7056 [dkt. 33]. Defendants Access and NCO Financial Services, Inc. have opposed that motion [dkt. 42], and plaintiff replied [dkt. 46]. The Court held a hearing on September 26, 2017 and requested supplemental briefing from the parties on the following issues: (1) whether the student loans held by Access are loans made under any program funded in whole or in part by a nonprofit institution such that the loans would be wholly excepted from discharge under § 523(a)(8)(A)(i), and (2) if not, what portion of such loans were certified by New York Law School as plaintiff's "costs of attendance" pursuant to 20 U.S.C. § 1087*ll*, such that some or all of the loan amounts may constitute qualified educational loans under § 523(a)(8)(B) [dkt. 60]. The Court received the parties' responsive submissions on November 20, 2017 [dkt. 67, 68]. The Court heard oral argument on January 23, 2018.

The Court has reviewed and carefully considered the parties' arguments and submissions. For the reasons discussed in this Memorandum Opinion and Order, the Court finds the loans held by Access to be educational loans made under a program funded in whole or in part by a nonprofit organization. Therefore, the loans at issue are wholly excepted from discharge under § 523(a)(8)(A)(i) unless plaintiff is able to demonstrate undue hardship. As to whether plaintiff's debt is nondischargeable based on the undue hardship exception, the Court finds that material issues of fact preclude summary judgment, and on that basis, the motion is denied.

II.    Jurisdiction

The Court has jurisdiction over this matter under 28 U.S.C. § 1334(a) and (b) and the Standing Order of Reference entered by the United States District Court for the

2

Eastern District of New York pursuant to 28 U.S.C. § 157(a), dated August 28, 1986, as amended by Order dated December 5, 2012, effective *nunc pro tunc* as of June 23, 2011. This is a core proceeding under 28 U.S.C. § 157(b)(2)(I) in which final orders or judgment may be entered by this Court pursuant to 28 U.S.C. § 157(b)(1).

III.    Background[3]

A.    Factual Background

Plaintiff is in her late thirties and an attorney licensed to practice law in the State of New York.  She is single, and has no children or other dependents.  At the time she filed her bankruptcy case, plaintiff lived with her parents.  Plaintiff earned a Bachelor of Arts degree in Communications and Media from Fordham University in 2000 and a Juris Doctorate from New York Law School in February of 2004.  From July 2011 to July 2012, plaintiff studied holistic health coaching at the Institute of Integrative Nutrition, where she finished the course requirements to be a holistic health coach but did not receive the certification due to an outstanding balance owed to the school.  Plaintiff suffers from sickle-cell disease.  She also suffers complications of sickle-cell disease, including avascular necrosis in both hips and gallbladder disease.

Access is a non-profit corporation operating exclusively for charitable and educational purposes within the meaning of section 501(c)(3) of the Internal Revenue Code, for the benefit of, to perform the functions of, or to carry out the purposes of post-secondary education institutions. Through the Access Group National Loan Program ("Access Loan Program"), Access offers both federally guaranteed and private, guaranteed education loans.  Plaintiff applied and was approved for three "Law Access" loans between 2000 and 2002 (the "Access

---

[3] The following facts are undisputed unless otherwise noted, and are taken from the parties' respective submissions under Local Bankruptcy Rule 7056-1 as well as documents submitted in connection with the pending motion for summary judgment.

Loans"), one loan for each year she attended law school. The Access Loans are private loans originally financed by National City Bank ("National City") through the Access Loan Program. National City assigned the Access Loans to Access pursuant to a Commitment and Loan Sale Agreement, first entered into on April 1, 1998 and subsequently amended or restated from time to time, under which National City agreed that it would sell to Access student loans National City originated pursuant to the Access Loan Program. The Access Loans were originated, marketed, guaranteed, funded and subsequently purchased by Access. The application completed by plaintiff for each of the three Access Loans contains a statement whereby plaintiff acknowledges that the Access Loan Program is funded in part by nonprofit institutions. Access currently holds the Access Loans. Kentucky Higher Education Student Loan Corp. was the servicer until the Access Loans were declared in default, at which time defendant NCO Financial Services, Inc. became the servicer for the Access Loans.

After graduating from law school, plaintiff worked as a royalty label support analyst at EMI Music from July 2004 to June 2006 and as a paralegal at Warner Music Group from June 2006 through September 2006 in hopes of breaking into the entertainment law industry. From November 2006 to December 2009, she was the Director of Legal and Business Affairs for Renegade Nation, an independent multi-media company. During this time, to minimize expenses, plaintiff moved back home to live with her parents, and made efforts to increase the amount of her monthly student loan repayment.

Toward the end of 2009, plaintiff moved to Florida and took on work as a document review attorney. In late November 2009, plaintiff spent a week in a hospital in Florida due to severe lower back and hip pain.

While in Florida, plaintiff also took on various odd jobs in addition to her legal work. She was an independent beauty consultant for Mary Kay Cosmetics; a guest service captain

for Miami Dolphins and University of Miami Hurricanes football games, concerts and special events held at Sun Life Stadium; an event coordinator for Bubblegum Event Planning; and for a brief period of time, a front desk receptionist for a health office. She also started her own business as a holistic health counselor in 2011. In 2012, plaintiff moved back to New York to live with her parents, and worked as a contract attorney for various temporary legal staffing agencies reviewing and analyzing documents.

In 2009, plaintiff had adjusted gross income of $69,539 and received a tax refund of $3,564. In 2010, plaintiff's adjusted gross income was $40,864 and she received a tax refund of $1,428. For 2011, her adjusted gross income was $34,653 and she received a tax refund of $927. In 2012, plaintiff's adjusted gross income was $23,930 and her tax refund was $1,912. For 2013, plaintiff's adjusted gross income was $59,638 and she received a tax refund of $2,097.

Plaintiff filed her chapter 7 petition on May 31, 2013. Her bankruptcy schedule I shows that at the time she commenced her bankruptcy case, she was employed as a contract attorney with Tower Legal Solutions with a monthly gross income of $4,277.20. Her net income after payroll deductions is listed as $2,929.55. She also lists $0.17 in interest. Thus, her total monthly income as set forth in Schedule I is $2,929.72. Her bankruptcy schedule J shows that she has $2,902 in monthly living expenses, including $400 for rent, $800 for food, $200 for clothing, $553 for transportation, $100 for medical and dental, $200 for recreation and entertainment, and $489 for vitamins, health and beauty aids and a gym membership. Plaintiff's monthly income exceeds her monthly expenses by $27.72.

Access does not dispute the facts in plaintiff's Local Rule 7056-1 Statement regarding her educational background and work history, or that she suffers from sickle cell disease. Access does, however, take issue with certain facts alleged by plaintiff, and asserts that:

1. The aggregate balance on the three Access Loans as of September 23, 2014 total $50,164.03 ($19,175.01 with respect to the first Access Loan, $16,775.08 with respect to the second Access Loan, and $14,213.94 with respect to the third Access Loan), rather than $52,724.03 as alleged by plaintiff.

2. Disbursements on all the Access Loans were made payable to plaintiff, but the checks were not sent to plaintiff as plaintiff alleges but to New York Law School.

3. Although plaintiff claims to have no assets, schedule B to plaintiff's bankruptcy petition lists personal property with a self-assessed value of $5,764.13.

4. Although plaintiff states that her expenses are below those set forth in the National and Local Standards published by the U.S. Internal Revenue Service ("IRS"), Access contends that the expenses disclosed on plaintiff's schedule J to her bankruptcy petition exceed the IRS' National Standards for food, clothing and other items for the relevant period.  Access observes that plaintiff listed food and clothing expenses of $1,000 per month, yet the IRS National Standards take from the website of the Office of the United States Trustee for use in bankruptcy cases has a limit of $403.

5. Plaintiff contends that she has made a total of $35,893 in student loan payments. Access notes that this amount appears to include payments made on student loan debt owed by plaintiff to Educational Credit Management Corporation. Access claims that the aggregate amount paid on the three Access Loans totals $22,999.36.

Additionally, in its response to plaintiff's 7056-1 Statement [dkt. 42], Access asserted the following additional material facts which it contends are undisputed. For her part, plaintiff takes issue with the facts as alleged by Access. *See*, plaintiff's reply [dkt. 46].

Plaintiff completed, under penalty of perjury, the first Access Application and Loan Agreement for a $15,000 loan on August 4, 2000, the second Access Application and Loan Agreement for a $14,000 loan on August 13, 2001, and the third Access Application and Loan

Agreement for a $12,500 loan on August 9, 2002. Each Access Application and Loan Agreement entered into by plaintiff states that the applicant certifies that loan proceeds will be used only for education expenses for the stated academic period at the educational institution identified in the application (i.e., New York Law School).

Access agreed twice to forebear from collecting any loan repayments during the life of the Access Loans. The first forbearance period began in October 2004 and ended in April 2005. From September 2005 through September 2007, plaintiff entered into an interest-only repayment plan with Access. The second forbearance period began in June 2010 and ended in December 2010. Plaintiff was declared in default of the Access Loans seven months after the second forbearance period ended. Plaintiff has not made any payments towards the Access Loans since May 2010, one month prior to the beginning of her second forbearance period. As of September 2014, $19,175.01 was outstanding on the first Access Loan, $16,775.08 on the second Access Loan, and $14,213.94 on the third Access Loan.

As to plaintiff's spending and recreational activities, Access claims the following. Plaintiff spends $110 per month for her cellular phone, an average of $200 per month for clothing, and an average of $489 per month for vitamins and herbal supplements, health and beauty products and services, and a gym membership. Plaintiff takes exercise classes at her gym, including yoga and Zumba, and uses exercise equipment, such as a treadmill, elliptical machine and stationary bicycle. She also works with a personal trainer at the gym, in addition to running outside in the morning and doing three-mile power walks several times a week.

Plaintiff's other expenses include hundreds of dollars for meals and beverages, hair and nail treatments, travel expenses and concert tickets. In February of 2014, plaintiff celebrated her birthday by taking a ten-day vacation to Haiti, at a cost of approximately $2,000. In February of 2013, plaintiff's boyfriend treated her to a trip to Paris, France to

celebrate her birthday and plaintiff spent approximately $500 there.  In the fall of 2013, plaintiff spent $113.85 to attend a John Legend concert.  In January of 2014, plaintiff spent more than $2,000 to attend a friend's wedding in Florida, which included airfare, hotel lodging, car rental, dress rental, makeup and other wedding preparation costs.  In July of 2014, plaintiff reimbursed a friend $300 for a $500 "VIP" ticket to a Jay-Z and Beyoncé concert.

Access claims that (i) plaintiff's medical condition does not prevent her from driving a car, taking public transportation or operating a computer, (ii) plaintiff is not taking any prescription medicine and has not seen her two physicians since 2009 and 2011, respectively, and (iii) plaintiff has not been admitted to the hospital since 2011, and can usually manage pain with Advil.

Access further contends that the fluctuation in plaintiff's income for the past several years is attributable to her working part-time versus full-time, and working in New York versus Florida in certain years, but is not attributable to any health-related issues.  Access notes that during the last five years, plaintiff has been terminated from employment for "performance issues or not billing enough hours".

In her reply, plaintiff objected to Access' characterization that she was somehow a "deadbeat slacker who lacks ambition".  Plaintiff argues that termination from document review assignments for not billing enough hours was not due to a lack of hard work on her part.  Rather, the projects often required a commitment of ten hours per day, seven days a week, for weeks at a time, and physically she was unable to meet those demands. Plaintiff contends that she could have applied for disability but chose not do so.

Plaintiff asserts that she has made extensive efforts to find employment and started her own business in order to generate income.  She used a portion of her 2013 tax refund to establish her own law practice, and was admitted to practice in the United States District

Court for the Eastern and Southern Districts of New York. In a five-month period, she only had two clients while continuing to incur expenses relating to her law practice.

Plaintiff takes issue with Access' characterization that she is living the high life and notes that she moved back to her parents' home in New York after being evicted from her Miami, Florida apartment. Plaintiff asserts that she filed for chapter 7 relief and commenced this adversary proceeding because she believes the student loans impose an undue hardship and inhibit her ability to obtain the fresh start she needs to get back on her feet. Plaintiff contends that just because she has not been hospitalized since 2011 and is not on prescription medication does not change her diagnosis or her life expectancy. While her holistic approach to managing her illness is unconventional, she argues that it makes sense for her.

B.    Procedural Background

Plaintiff commenced this adversary proceeding seeking to except from discharge her student loan debt. [dkt. 1].[4] Plaintiff subsequently filed an amended complaint, adding defendants Access and NCO Financial Services, Inc. [dkt. 15]. Defendants Access and NCO Financial Services, Inc. answered [dkt. 21]. Following the close of discovery, plaintiff moved for summary judgment [dkt. 33]. Access opposed [dkt. 42], and plaintiff replied [dkt. 46]. As noted above, the Court requested and received supplemental briefing from the parties on the issue of whether the Access Loans qualify as educational loans under § 523(a)(8) [dkt. 67, 68].

IV.    Summary Judgment Standard

Under Rule 56 of the Federal Rules of Civil Procedure, made applicable by Bankruptcy Rule 7056, summary judgment may not be granted unless the movant shows, based on admissible evidence in the record placed before the court, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

---

[4] As noted above, plaintiff's action against defendant Educational Credit Management Corporation was settled. *See*, Stipulation and Order [dkt. 53].

Civ. P. 56(a); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986) ("[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'") (quoting former Fed. R. Civ. P. 56(c). A fact is considered material if it "might affect the outcome of the suit under the governing law," and a genuine dispute exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

The moving party bears the burden of demonstrating the absence of a genuine dispute as to any material fact. *Celotex,* 477 U.S. at 322-23. If the moving party meets its initial burden, the opposing party "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (quoting former Fed. R. Civ. P. 56(e)). "A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," as "mere conclusory allegations or denials … cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines,* 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher v. Atex, Inc.,* 68 F.3d 1451, 1456 (2d Cir. 1995)). Thus, to meet its burden, the opposing party must offer more than a "scintilla of evidence" that a genuine dispute of material fact exists, *Anderson,* 477 U.S. at 252, or that there is some "metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586. It must present "significant probative evidence" that a genuine issue of fact exists. *Anderson,* 477 U.S. at 249 (internal citations and quotations marks omitted).

On a motion for summary judgment, the court must "construe all evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities

in its favor." *Dickerson v. Napolitano*, 604 F.3d 732, 740 (2d Cir. 2010). The Court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Ed.*, 444 F.3d 158, 162 (2d Cir. 2006) (citing *Anderson*, 477 U.S. at 249)). "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Jeffreys v. City of New York,* 426 F.3d 549, 553-54 (2d Cir. 2005) (citation omitted).

V.     Discussion

Plaintiff asserts that the loans held by Access are not "qualified educational loans" entitled to protection under § 523(a)(8)(B) because she used a portion of the loan proceeds for expenses other than the cost of attendance at New York Law School.  Plaintiff states that along with defraying expenses for tuition, books, housing and transportation, she used some of the loan proceeds for birthday gifts, holiday shopping, concert tickets and the like. In plaintiff's view, because she used a portion of the loan proceeds for social or living expenses and not solely for tuition and other costs of attendance, the loans fall outside the protection of § 523(a)(8)(B) and are dischargeable.  In the alternative, plaintiff contends that if the Access Loans are "qualified educational loans" under § 523(a)(8)(B), they are dischargeable based upon the undue hardship exception to nondischargeability in § 523(a)(8).  In support of her argument that payment of her student loan debt will impose an undue hardship, plaintiff asserts that she satisfies the three-part test set forth in *Brunner*.

In opposing plaintiff's motion, Access argues that the Access Loans are "qualified educational loans" under § 523(a)(8)(B), or are educational loans made under a program funded by a nonprofit institution under § 523(a)(8)(A)(i). This is the case, Access claims, irrespective of how plaintiff used the loan proceeds.  As such, Access takes a different view of how the loans should be characterized.  It contends that the stated purpose of the loan, and

not the actual use of loan proceeds, is determinative. When viewed from this perspective, Access claims that the student loans fall under the protection of § 523(a)(8) and are nondischargeable unless plaintiff can demonstrate that excepting the student loan debt from discharge would impose an undue hardship on her. To do so, Access contends that plaintiff must meet each element of the three-part test set forth in *Brunner*, and plaintiff has not made a sufficient showing at this stage that her repayment of the Access Loans would impose an undue hardship.

As discussed below, the Court concludes that the Access Loans are educational loans for purposes of § 523(a)(8)(A)(i) because they are educational loans made under a program funded in whole or in part by a nonprofit institution. However, the Court also finds that that there are genuine disputes of material facts concerning whether payment of the loans imposes an undue hardship that would render them dischargeable. Accordingly, summary judgment on this issue is inappropriate.

A.    Whether the Access Loans are Educational Loans Under § 523(a)(8)

Section 523(a)(8) provides that, except in cases of undue hardship, the following types of educational loans are protected from a bankruptcy discharge:

> (A)(i) an educational benefit overpayment or loan made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution; or
>
>      (ii) an obligation to repay funds received as an educational benefit, scholarship, or stipend; or
>
> (B) any other educational loan that is a qualified educational loan, as defined in section 221(d)(1) of the Internal Revenue Code of 1986, incurred by a debtor who is an individual.

11 U.S.C. § 523(a)(8).

Accordingly, there are four categories of educational loans that are nondischargeable under § 523(a)(8):

> (1) educational benefit overpayments or loans made, insured, or guaranteed by a governmental unit;
>
> (2) educational benefit overpayments or loans made under any program partially or fully funded by a governmental unit or nonprofit institution;
>
> (3) obligations to repay funds received as an educational benefit, scholarship, or stipend; and
>
> (4) any other educational loan that is a "qualified education loan" under section 221(d)(1) of the Internal Revenue Code.

11 U.S.C. § 523(a)(8)(A)(i), (ii) and (B). The first three categories fall within § 523(a)(8)(A), while the last category falls under § 523(a)(8)(B). Subsections (A) and (B) of § 523(a)(8) are mutually exclusive. *Campbell v. Citibank, N.A. (In re Campbell)*, 547 B.R. 49, 55 (Bankr. E.D.N.Y. 2016). Consequently, educational loans that are *not* either (i) made, insured, or guaranteed by a governmental unit or (ii) made under any program partially or fully funded by a governmental unit or nonprofit institution, may be excepted from discharge under § 523(a)(8)(B) if they are "qualified educational loans".

Here, it is undisputed that Access is a non-profit institution and the Access Loans were made under the Access Loan Program which is funded in whole or in part by a nonprofit institution. While National City originated the Access Loans, it assigned the loans to Access pursuant to the Commitment and Loan Agreement between National City and Access entered into on April 1, 1998, as amended and restated from time to time. Thus, Access is the current holder of the Access Loans. Additionally, each of the Access Loan agreements provides that "the Access Group Programs are funded in part by nonprofit institutions, and that [the] loan is therefore subject to the limitations on dischargeability in bankruptcy contained in Section 523(a)(8) of the United States Bankruptcy Code."

Courts have generally found that loans associated with the Access Loan Program, including loans that are ultimately purchased or guaranteed by Access or other non-profit institutions, to be excepted from discharge under § 523(a)(8)(A). *O'Brien v. First Marblehead Educ. Res., Inc. (In re O'Brien)*, 419 F.3d 104, 107 (2d Cir. 2005) (affirming district court's

determination that private loan issued under the Access loan program by a bank was nondischargeable pursuant to § 523(a)(8)(A) because the loan was guaranteed by a non-profit institution); *Educ. Res. Inst., Inc. v. Taratuska (In re Taratuska)*, No. 07-11938-RCL, 2008 U.S. Dist. LEXIS 93206, at *7-9, 2008 WL 4826279, at *4-5 (D. Mass. Aug. 25, 2008) (discussing cases concerning funding or guarantees provided by non-profit institutions, including those associated with the Law Access Program, with respect to student loans); *HEMAR Service Corp. of America, Inc. v. Pilcher (In re Pilcher)*, 149 B.R. 595, 599-600 (B.A.P. 9th Cir. 1993); *Johnson v. Access Group, Inc. (In re Johnson)*, No. 1:05-bk-00666MDF, Adv. No. 1:05-ap-00162, 2008 Bankr. LEXIS 3325, at * 10, 2012 WL 5120913, at *3 (Bankr. M.D. Pa. Dec. 3, 2008) (finding the debtor's student loans from National City Bank through the Law Access Program constituted education loans funded in part by a non-profit institution as set forth under § 523(a)(8) as a result of Access' administration of the Law Access Program, guarantee of the debtor's loans, and purchase of those loans); *Bolen v. Sallie Mae Servicing Corp. (In re Bolen)*, 287 B.R. 127, 131 (Bankr. D. Vt. 2002) (finding that the Law Access Program was partially funded by nonprofit institutions and thus, the program falls within the statutory framework of § 523(a)(8)).

The protection accorded educational loans under § 523(a)8)(A)(i) extends to private loans provided the overall loan program pursuant to which such loans were issued received non-profit funding. *Pilcher*, 149 B.R. at 600 (holding that § 523(a)(8) does not require the actual loan itself be funded by a non-profit institution, only that the overall educational loan program, in this case the Law Access Program, receive non-profit funding, then the exception from discharge was met, subject to a finding of no hardship); *Vuini v. Zions Bank (In re Vuini)*, Bankr. No. 6:11-bk-07559-KSJ, Adv. No. 6:11-ap-00227-KSJ, 2012 Bankr. LEXIS 5326, at *10, 2012 WL 5554406, at *3 (Bankr. M.D. Fla. Nov. 14, 2012) (holding that Access

Group's private, non-profit loan to cover the cost of a Florida Bar Review course falls under § 523(a)(8)); *Bolen*, 287 B.R. at 131-132 (finding private loans not federally subsidized but issued pursuant to the Law Access program fall within § 523(a)(8)); *Pincus v. Graduate Loan Ctr. (In re Pincus)*, 280 B.R. 303, 318 (Bankr. S.D.N.Y. 2002) (denying discharge of private loans issued pursuant to the Access Law Program would not impose an undue hardship on debtor).

Thus, based upon the record placed before it, the Court finds that the Access Loans are educational loans for purposes of § 523(a)(8)(A)(i), to wit, educational loans made under a program funded in whole or in part by a nonprofit institution. Because the subsections of § 523(a)(8) are mutually exclusive, the Court need not address plaintiff's argument that the Access Loans are not "qualified educational loans" under § 523(a)(8)(B). The Court will, however, address plaintiff's argument that she is entitled to judgment based on her use of the loan proceeds for non-educational purposes, such as rent, food, transportation, and other living expenses, including purchases of gifts, while she attended New York Law School.

Courts have held that the stated purpose and not the actual use of the loan determines whether a loan is an "educational loan" excepted from discharge under § 523(a)(8). *Murphy v. Pa. Higher Educ. Assistance Agency (In re Murphy)*, 282 F.3d 868 (5th Cir. 2002); *Busson-Sokolik v. Milwaukee Sch. of. Eng'g (In re Busson-Sokolik)*, 635 F.3d 261, 266 (7th Cir. 2011), *cert. denied*, 564 U.S. 1020 (2011); *Maas v. Northstar Educ. Fin., Inc. (In re Maas)*, 497 B.R. 863, 879 (Bankr. W.D. Mich. 2013), *aff'd*, 514 B.R. 866 (W.D. Mich. 2014).

In *Murphy,* the Fifth Circuit stated that:

> [p]ermitting students to discharge student loans in bankruptcy because the student spent the money on social uses, alcohol, or even drugs would create an absurd result. Students who use the loan proceeds to finance an education would retain the burden of paying them even after a chapter 7 discharge; irresponsible

> students who abuse the loans would gain the benefits of discharge.

*Murphy*, 232 F.3d at 873 (affirming lower court's holding that loan proceeds in excess of tuition and expenses used by debtor for discretionary spending, such as car, housing, food, fraternity dues and other ordinary living expenses, did not except debt from discharge).

The purpose of the loan approach has been found to be "most consistent with the language of section 523(a)(8)(A)" for loans made, insured, or guaranteed by a governmental unit or loans made under any program partially or fully funded by a governmental unit or nonprofit institution. *Busson-Sokolik*, 635 F.3d at 266. The purpose of the loan approach "aligns with the broader goal of protecting lenders against debtors who divert educational funds toward other uses" and avoids the problem of irresponsible debtors obtaining a discharge while responsible debtors do not, "by refocusing the inquiry on the nature and character of the loan." *Id.* (following *Murphy* in holding that under the purpose driven test, the loan at issue was educational and nondischargeable); *Maas*, 497 B.R. at 879 (finding that actual use of the loan proceeds to be immaterial and that the debtor received an educational benefit from the loans because the loans were premised upon the debtor's status as a student and were for educational purposes).

Here, at the time plaintiff obtained the Access Loans, she certified on each loan application that:

> the proceeds of my loan will be used for educational purposes for the academic period stated in my Application and Loan Agreement at the educational institution named on my Application and Loan Agreement. I understand that I am responsible for repaying immediately any funds that I receive which are not to be used or are not used for educational expenses related to attendance at the institution stated for the loan period stated.

Thus, from the inception of the loans, plaintiff acknowledged and agreed that the proceeds would be used for educational purposes. Plaintiff's actual use of a portion of the loan proceeds

to defray expenses not associated with her attending New York Law School does not alter the character of the Access Loans as nondischargeable educational loans under § 523(a)(8). Plaintiff's argument suggests that the full amount of a student loan obligation falls outside the protection accorded educational debt under § 523(a)(8) whenever a portion of the loan proceeds is used to defray expenses that are not incidental to a student's education. Plaintiff's argument is unavailing. The expenses must serve an educational purpose. In short, they must have a relationship to a student's cost of attending school. To find otherwise would render § 523(a)(8) meaningless, and lead to abuse.[5]    Accordingly, the Court finds that plaintiff's actual use of the Access Loan proceeds is not determinative of whether the Access Loans are dischargeable.

B.    Whether Repayment of the Access Loans Will Impose an Undue Hardship

Plaintiff alleges that repayment of her student loan obligation will impose an undue hardship on her. To prevail on this claim, plaintiff must show that (1) she cannot maintain, based on her current income and expenses, a "minimal" standard of living for herself and her dependents if forced to repay the loans, (2) additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans, and (3) she has made good faith efforts to repay the loans. *Brunner*, 831 F.2d at 396.

Plaintiff has the burden of proving by a preponderance of evidence that her student loan debt should be discharged, especially on the basis of "undue hardship". *Turturo v. Access Group, Inc. (In re Turturo)*, 522 B.R. 419, 426 (Bankr. N.D.N.Y. 2014) (citing *Grogan v.*

_____

[5] The Court notes that the stated purpose of the loan approach also has been followed by courts when determining whether an educational loan is a "qualified educational loan" under § 523(a)(8)(B). *See*, *Carow v. Chase Loan Serv. (In re Carow)*, Bankr. No. 10-30264, Adv. No. 10-7011, 2011 Bankr. LEXIS 823, at *9-10 (Bankr. D.N.D. Mar. 2, 2011); *Noland v. Iowa Student Loan Liquidity Corp. (In re Noland)*, Bankr. No. 09-80873-TJM, Adv. No. 09-8048-TJM, 2010 Bankr. LEXIS 1188, at *8-9; 2010 WL 1416788, at * 3-4 (Bankr. D. Neb. Mar. 2, 2010).

*Garner*, 498 U.S. 279, 291 (1991)).  "If one of the requirements of the *Brunner* test is not met, the bankruptcy court's inquiry must end there, with a finding of no dischargeability." *Williams v. N.Y. State Higher Educ. Serv. Corp.*, 296 B.R. 298, 302 (S.D.N.Y. 2003), *aff'd*, 84 Fed. Appx. 158 (2d Cir. 2004) (quoting *Pa. Higher Educ. Assistance Agency v. Faish (In re Faish)*, 72 F.3d 298, 306 (3d Cir. 1995), *cert. denied*, 518 U.S. 1009 (1996); *see also Bacote v. Educ. Credit Mgmt. Corp.*, 2006 Bankr. LEXIS 4645, at *23 (Bank. S.D.N.Y. 2006) (citing *Williams*).

### i.    Minimal Standard of Living

In determining whether a debtor has satisfied the first *Brunner* factor, courts focus on household income and the expenses necessary to meet a debtor's basic needs, such as food, shelter, clothing, transportation and medical treatment, and assess whether a debtor has sought to maximize income while minimizing certain discretionary expenses. *Pincus*, 280 B.R. at 318.  A debtor need not "live a life of abject poverty, but it does require 'more than a showing of tight finances.'" *Johnson v. Sallie Mae Inc. (In re Johnson)*, 550 B.R. 874, 879 (Bankr. M.D. Ala. 2016) *(quoting *McLaney v. Ky. Higher Educ. Assistance Auth. (In re McLaney)*, 375 B.R. 666, 674 (M.D. Ala. 2007)).  *See also Mosley v. General Revenue Corp. (In re Mosley)*, 330 B.R. 832, 841 (Bankr. N.D. Ga. 2005), *aff'd*, 494 F.3d 1320 (11th Cir. 2007); *Faish*, 72 F.3d at 306.  A debtor must demonstrate financial circumstances that goes beyond the "garden-variety financial hardship" that most debtors experience.  *Wolph v. U.S. Dept. of Educ. (In re Wolph)*, 479 B.R. 725, 729 (Bankr. N.D. Ohio 2012); *Pincus*, 280 B.R. at 317 (finding the minimal standard of living to require more than significant forbearance in personal and financial matters or a restricted budget).

Plaintiff argues that while she is earnestly seeking to build her law practice, she continues to live with her parents and pay them $100 a week whenever she can.  An amount

she contends is far less than alternative housing costs. Additionally, plaintiff argues that instead of purchasing medicine to treat her medical condition and symptoms, she spends approximately $150 per month for vitamins and supplements, $90 a month for a gym membership, and purchases her groceries from Whole Foods Market. This, plaintiff asserts, is part of her holistic approach to coping with her illness.

Access offers a different account of plaintiff's expenses. It argues that plaintiff has failed to show that she cannot maintain both a minimal standard of living and repay the Access Loans when her expenses include trips, concert tickets, dining out, and nail and hair treatments. Plaintiff counters that the trips were one-time events and her expenses are part of her efforts to manage her symptoms holistically with diet and lifestyle choices, which includes spending a significant portion of her disposable income on food, vitamins and herbal supplements, gym membership, spa treatments, and the like.

Thus, the parties strongly disagree on whether plaintiff has met the first *Brunner* factor. In short, on the record placed before the Court, there are triable issues of fact concerning whether some of plaintiff's expenses are necessary to provide for her basic needs, whether expenditures on personal expenses are improvident, and whether plaintiff should be required to take steps to increase her income and, in particular, reduce her expenses.

ii.     Whether Additional Circumstances Exist

In order to satisfy the second *Brunner* factor, a debtor must establish that her current inability to pay her student loan debt is likely to persist for a significant portion of the repayment period. *Johnson*, 550 B.R. at 880; *Mosley*, 330 B.R. at 842. In determining whether a debtor has met this second factor, courts consider the debtor's job skills, age, health, the number of working years remaining, and whether the debtor has maximized her income potential. *Turturo*, 522 B.R. at 427; *Traversa v. Educ. Credit Mgmt. Corp. (Traversa)*, 444 Fed. Appx. 472, 474-75 (2d Cir. 2011), *cert. denied*, 133 S. Ct. 135 (2012). In addressing

this factor, a debtor must demonstrate that the additional circumstances point to a "certainty of hopelessness" and not merely a present inability to pay student loan debt. *Mosley*, 494 F.3d at 1326; *Johnson*, 550 B.R. at 880.

Because the Court has determined that there are triable issues of fact concerning whether plaintiff has met the first *Brunner* factor, i.e., a current inability to make student loan payments, there is no basis for the Court to find that plaintiff's current state of affairs is likely to persist for a significant portion of the repayment period. The second factor focuses on a debtor's long-term ability to make student loan payments, and is premised upon there being a current inability to pay. "The state of affairs referred to in the second prong is the determination made in the first prong, *i.e.*, that the debtor cannot maintain, based upon current income and expenses, a minimal standard of living for herself and her dependents if required to repay her student loan". *Douglas v. Educ. Credit Mgmt. Corp.* (*In re Douglas*) 366 B.R. 241, 255 (Bankr. M.D. Ga. 2007). Accordingly, because plaintiff has not made a sufficient showing at this stage that she has met the first *Brunner* factor, the Court is unable to determine on the record placed before it whether plaintiff has met the second *Brunner* factor.

Even if the Court found that the factual question raised by the first *Brunner* factor is indisputable based on plaintiff's submissions, it would nevertheless find, based on the record placed before it, that there are triable issue of fact concerning whether plaintiff's medical condition, which is the crux of her argument in support of the second *Brunner* factor, impairs her ability to earn enough income to satisfy her student loan debt. While Access does not dispute that plaintiff suffers from sickle cell disease, and complications from such disease, including avascular necrosis and gallbladder disease, the parties strongly disagree regarding whether plaintiff's medical condition prevents her from performing job functions and earning

sufficient income to repay her student loan debt.[6]  Hence, even if plaintiff had satisfied the threshold question posed by the first *Brunner* factor, i.e., a current inability to pay her student loan debt, the evidence submitted by the parties on the second *Brunner* factor shows that there is a genuine dispute whether plaintiff's medical condition and other additional circumstance are indicative of her inability in the future to pay her student loan debt.

### iii.    Good Faith

In order to satisfy the third *Brunner* factor, plaintiff must show that she has made good faith efforts to repay her student loan debt. "Good faith, in this context, is essentially an inquiry into whether the debtor has consciously or irresponsibly disregarded his or her repayment obligation—or instead, whether there is some justification for the debtor's default and ongoing inability to repay the loan." *Crawley v. Educ. Credit Mgmt. Corp.* (*In re Crawley*), 460 B.R. 421, 444 (Bankr. E.D. Pa. 2011).  In determining whether a debtor has made good faith efforts to repay student loans, courts examine the debtor's repayment history and consider whether the debtor's inability to pay was due to circumstances beyond the debtor's control as opposed to lifestyle choices.  *Johnson*, 550 B.R. at 881; *Benjumen v. AES/Charter Bank (In re Benjumen)*, 408 B.R. 9, 22 (Bankr. E.D.N.Y. 2009).

Consideration of the third *Brunner* factor assumes that a debtor has established both a short-term inability to repay (first *Brunner* factor) and a long-term inability to repay (second *Brunner* factor).  Here, because plaintiff has not made a sufficient showing at this stage to warrant summary judgment on both of these factors, the Court expresses no view with respect to the third factor and reserves its judgment on the issue for trial.

---

[6] Where a debtor claims to suffer from a medical condition, the debtor must "precisely identify her problems and explain how her condition would impair her ability to work in the future."  *Trudel v. U.S. Dep't of Educ. (In re Trudel)*, 514 B.R. 219, 226 (B.A.P. 6th Cir. 2014) (quoting *Tirch v. Pa. Higher Educ. Assistance Agency (In re Tirch)*, 409 F.3d 677, 681 (6th Cir. 2005)).  The debtor must demonstrate "a strong nexus between the medical condition and its adverse effect on the debtor's terms of employment (specifically, a debtor's income) must be shown."  *Trudel*, 514 B.R. at 226 (quoting *Morrow v. U.S. Dep't of Educ. (In re Morrow)*, 366 B.R. 774, 778 (Bankr. N.D. Ohio 2007)).

However, the Court notes that the parties strongly disagree on whether plaintiff's repayment history, and her efforts to secure and maintain employment, maximize income and minimize expenses, is sufficient to satisfy the third *Brunner* factor. Plaintiff points out that she made sixty-one consecutive monthly payments ranging from $278 to $618 during the period 2004 to 2010 while employed full-time in the entertainment industry, and sought deferral of payments via forbearance agreements at a time when she was hospitalized. This, plaintiff argues, evinces good faith efforts to pay back her student loans. She claims that working excessive hours as an entertainment attorney and thereafter as a contract attorney added to her medical issues and, for health reasons, she cannot work long hours in order to earn a higher income. For its part, Access again argues that plaintiff's expenditures on personal expenses appear to be improvident, and her lifestyle choices demonstrate a lack of good faith irrespective of her medical condition. Both parties will have an opportunity at trial to persuade the Court that its evidence on the issue of "good faith efforts" will carry the day, just as they will each have the opportunity to show whether the first and second *Brunner* factors have been satisfied.

VI.    Conclusion

For the foregoing reasons, plaintiff's motion for summary judgment is denied. The parties shall comply with this Court's pretrial order issued concurrently with this decision, and are directed to attend a final pretrial conference on March 27, 2018 at 11:00 a.m., at which time the Court will set a trial date.

SO ORDERED.

Dated: February 23, 2018
       Central Islip, New York

**Louis A. Scarcella**
**United States Bankruptcy Judge**

22